IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 18-cr-00407-PAB

UNITED STATES OF AMERICA,

Plaintiff,

v.

1.    ANDREW SILVERMAN,

Defendant.

---

**RECOMMENDATION ON
(1) DEFENDANT ANDREW SILVERMAN'S OBJECTION, CLAIMS OF
EXEMPTION AND RESPONSE TO WRITS OF GARNISHMENT (DKT. #42) AND
(2) INTERESTED PARTY TRACEY SILVERMAN'S OBJECTION, CLAIMS OF
EXEMPTION AND RESPONSE TO WRITS OF GARNISHMENT (DKT. #43).**

---

Entered by Magistrate Judge N. Reid Neureiter

## I.    Introduction and Procedural Background

        This matter comes before the Court on Defendant Andrew Silverman's Objection,

Claims of Exemption, and Response to Writs of Garnishment, filed October 9, 2019.

Dkt. #42. Also before the Court is a similar Objection, Claims of Exemption, and

Response to Writs of Garnishment (also dated October 9, 2019) filed by Mr. Silverman's

wife, Tracy Silverman. Dkt. #43. At issue are attempts by the United States to garnish

various bank and investment accounts owned by the Silvermans to satisfy a restitution

judgment of more than $2 million that Mr. Silverman was ordered to pay in connection

with his criminal sentence.

On October 10, 2019, Judge Brimmer referred the Objections to me. Dkt. #44. Both Mr. and Mrs. Silverman sought an evidentiary hearing. On October 10, 2019, I set a hearing on these issues for November 5, 2019. Dkt. #45.

On October 24, 2019, Mr. Silverman sought leave to present by telephone testimony of his attorney in the criminal matter, Mr. Gerald Krovatin. Dkt. #51. The United States did not oppose the request and I granted the Motion of October 25, 2019. Dkt. #53. Mr. Silverman submitted an exhibit list and a witness list the morning of the November 5, 2019 hearing. *See* Dkt. ##60 & 61.

The afternoon of November 5, 2019, I held an evidentiary hearing and argument on the Silvermans' objections and claims of exemption. *See* Dkt. #64 (Transcript of Proceedings). The hearing lasted approximately three hours. I heard live testimony from Mr. Silverman. Mr. Silverman's attorney in the underlying criminal matter, Gerald Krovatin, did testify by telephone from New Jersey.

At the commencement of the hearing, the United States objected to Mr. Silverman testifying. The United States asserted that the hearing was initially scheduled as a "motions hearing," and that it had only learned that Mr. Silverman was going to testify the morning of the proceeding. The United States' objection to Mr. Silverman's testimony was overruled on basis that the United States had been given adequate notice that it would be an evidentiary hearing. The Court had approved in advance the telephone testimony of Mr. Krovatin. It was apparent that this was likely to be an evidentiary hearing, and the United States should have been prepared to cross-examine Mr. Silverman.

## II.     Background Facts

### A.     The Underlying Offense and Judgment

In July 2015, the United States District Court for the District of New Jersey entered a criminal judgment against the Defendant, Andrew Silverman. *United States v. Silverman*, Crim, No. 15-cr-70, Dkt. #14 at 1 (D.N.J., July 21, 2015). Mr. Silverman had pled guilty to wire fraud in violation of 18 U.S.C. §1343.

Mr. Silverman was President, CEO and owner of DataQ Internet Equipment Corporation, located in King of Prussia, Pennsylvania. Mr. Silverman pled guilty to taking unlawful advantage of certain discount programs created by Hewlett-Packard and Cisco Systems which authorized substantial discounts to specific end-users who agreed to use purchased electronics and computer products internally and not re-sell them. To take advantage of these discounts, a customer had to verify in writing that the products were intended solely for the customer's internal use, would remain in the country of origin, and were not for resale. Mr. Silverman committed fraud by obtaining large quantities of Hewlett-Packard and Cisco computer equipment via straw buyers at deeply discounted prices to which he was not entitled. He did so by making materially false and fraudulent representations about his identity and intended uses of the equipment and then reselling the computer equipment for his own benefit. This involved fraud across international borders, including in Japan, Indonesia, Germany and Latin America. It was contrary to the terms of HP's and Cisco's programs and contrary to Mr. Silverman's representations to HP and Cisco. Dkt. #2 at 7-8.

The victim impact statements submitted by Cisco and Hewlett-Packard indicated harm to Cisco of more than $8 million and harm to Hewlett-Packard in excess of $17 million.

Once he was contacted by law enforcement, Mr. Silverman admitted his conduct, provided significant cooperation, and entered into an early plea agreement. In its victim impact statement, Hewlett-Packard did not request that the court enter any additional amount of restitution beyond the $2.5 million agreed between Mr. Silverman and the United States. But Hewlett-Packard did express disappointment that Mr. Silverman was only required to pay $500,000 of the restitution amount prior to sentencing. Said Hewlett-Packard, "It is unfortunate, however, that Mr. Silverman has only paid $500,000 of that restitution amount, and in fact there is uncertainty regarding when or even if HP will be paid the remainder of the restitution obligation. In light of the magnitude of the losses caused by Mr. Silverman, HP would have expected that he would have paid the remaining $2,000,000 restitution in advance of sentencing." Dkt. #2 at 16. Prior to his sentencing, Mr. Silverman did pay $500,000 toward the restitution amount.

Mr. Silverman was sentenced to a six-month prison term and ordered to pay (1) a $100 special assessment, (2) a $75,000 fine and (3) $2.5 million in restitution. *See* Dkt. #42-1 at 2-9 (Judgment in a Criminal Case, attached as Exhibit to Affidavit of Gerald Krovatin). Restitution was to be paid to Hewlett-Packard Company ($2.167 million) and Cisco systems, Inc ($332,500). *Id.*

The judgment of conviction contains the following language with respect to the $75,000 fine:

> This fine, plus any interest pursuant to 18 U.S.C. § 3612(f)(1), **is due immediately.** In the event the fine is not paid prior to the commencement

of supervision, the defendant shall satisfy the amount due in monthly installments of no less than $1,000, to commence 30 days after release from confinement.

Dkt. #42-1 at 9. (emphasis added). The judgment also contains similar language with respect to the ordered restitution:

> **The restitution is due immediately.** It is recommended that the defendant participate in the Bureau of Prisons Inmate Financial Responsibility Program. (IFRP). If the defendant participates in the IFRP, the restitution shall be paid from those funds at a rate equivalent to $25 every 3 months. In the event the entire restitution is not paid prior to the commencement of supervision, the defendant shall satisfy the amount due in monthly installments of no less than $1,000, to commence 30 days after release from confinement.

Dkt. #42 at 10 (emphasis added).

## B.    The Silvermans' Assets and Residences

As reflected in the pre-sentence report, Mr. Silverman disclosed that he and his wife, Tracy, had a net worth of nearly five million dollars, including four vehicles, a boat, two jet skis, and residences in Gladwyne, Pennsylvania, on the Jersey Shore, in Snowmass, Colorado, and a condo in Penn Valley, Pennsylvania.[1] Dkt. #2 at 25.

Mr. Silverman and his wife now reside at the single-family home in Snowmass. Prior to moving to Colorado, the Silvermans lived in Gladwyne, in the Eastern District of Pennsylvania, near Philadelphia. Mr. Silverman testified that were he and his wife to sell the house in Gladwyne, he would hope to generate somewhere between $1.5 and $1.8 million. Dkt. #64 at 60:1-4. The house in Snowmass, Colorado is worth in the range of $800,000. *Id.* at 65:20-22. Mr. Silverman testified that he contributed money from his earnings for the purchase of all of this real estate. *See Id.* at 64-65. Based on Mr.

---

[1] The United States relates in its filings that the Silvermans no longer own the condominium in Penn Valley, Pennsylvania.

Silverman's income level as President and CEO of his company, and the fact that Mrs. Silverman's occupation was that of a teacher with a relatively modest income, it is a reasonable inference that substantially all of these real estate assets were purchased using funds generated from Mr. Silverman's income from and ownership of DataQ. On May 5, 2017, jurisdiction in Mr. Silverman's case was transferred from the District of New Jersey to the Eastern District of Pennsylvania, where Mr. Silverman first resided on his release from prison.

### C. The Writs of Garnishment

On June 26, 2017, the United States Attorney's Office for the Eastern District of New Jersey applied to the District Court for the District of New Jersey for writs of garnishment directed at the following garnishees: TD Ameritrade, Inc., Oppenheimer & Co. Inc., and the Vanguard Group, Inc. *See United States v. Silverman*, Crim. No. 15-cr-70, Dkt. ##18, 20, 24. Because jurisdiction had been transferred from the District of New Jersey to the District of Pennsylvania, the District of New Jersey arguably did not actually have jurisdiction to issue the writs. But it did so anyway, the same day the writs were requested. *Silverman*, Crim. No. 15-cr-70, Dkt. ##19, 21 & 25.

On March 1, 2018, nearly a year after jurisdiction had been transferred to the Eastern District of Pennsylvania, the District of New Jersey withdrew the writs of garnishment, purportedly at the request of the United States Attorney's Office in New Jersey. The motivation for the withdrawal is disputed.

On September 6, 2018, jurisdiction over Mr. Silverman as a supervised releasee was transferred to the District of Colorado from the Eastern District of Pennsylvania. *See* Dkt. #1.

On February 12, 2019, the United States applied for writs of garnishment from the District of Colorado directed at Oppenheimer, TD Ameritrade, and Vanguard. Dkt. ##5-7. The District Court for the District of Colorado issued the writs the next day. Dkt. ##8-10. Vanguard filed its Answer on February 26, 2019. Dkt. #11. Oppenheimer filed its Answer on March 4, 2019. Dkt. #12. Ameritrade filed its Answer on March 12, 2019. Dkt #20.

In its Answer, Vanguard identified an IRA brokerage account in the name of Andrew F. Silverman, with a total value of $309,655.62 as of February 15, 2019. Vanguard also maintains a joint brokerage account registered in the names of Tracey L. Silverman and Andrew F. Silverman, joint tenants. ("Joint Account" or "Vanguard Joint Account"). The assets of Joint Account consisted of various securities and had a market value of $179,569.98 as of February 15, 2019. Also with Vanguard was a Uniform Transfer to Minor Account ("UTMA") account registered to Andrew F. Silverman, as custodian of Shayna B. Silverman. Dkt #11 at 1.  On March 7, 2019, the United States stipulated to release of the UTMA Account held by Vanguard as custodian for Shayna Silverman. Dkt. #16.

Based on a recent payment history report, a balance of approximately $2,059,077 remains outstanding on Mr. Silverman's fine and restitution debt. Defendant's Hearing Exh. A (Debtor Statement dated October 4, 2019 issued by U.S. Department of Justice for Andrew Silverman).

## III.     Genesis of the Dispute

The Silvermans object to the United States seeking to seize assets of Mr. Silverman to satisfy the outstanding judgment so long as Mr. Silverman continues to

pay $1,000 per month as specified in the judgment of conviction. One element of the dispute between Mr. Silverman and the United States is the language in the judgment with respect to payment of the fine and the restitution. The language says that if the amounts are not paid prior to the commencement of the sentence, then "the defendant *shall satisfy the amount due in monthly installments of no less than $1,000*, to commence 30 days after release from confinement." (emphasis added). Mr. Silverman had not paid the entire amount due prior to the commencement of the sentence. Instead, per the language of the judgment, he has been paying timely $1,000 a month to satisfy the restitution and fine. But at the rate of $1,000 per month, the roughly $2,059,000 outstanding restitution amount (plus interest) will not be repaid for approximately 170 years. Therefore, the United States, charged as it is with the duty to recover full and timely restitution for victims of Mr. Silverman's crime, is seeking to satisfy the outstanding $2 million fine and restitution judgment by seizing Mr. Silverman's other assets—including via garnishment of his IRA and other accounts. The question before me is whether the United States is precluded from doing so, either by the language of the judgment itself, by actions or statements by the United States that estop the government from collecting the debt via garnishment, or by other principles of equity or law.

## IV.     The Silvermans' Specific Objections to the Writs of Garnishment

### A.     *Unfair Increase in Judgment Fine Amount Resulting from Garnishment of IRA Accounts*

Mr. Silverman makes a number of objections to the writs. First, one account covered by the writs is an individual retirement account ("IRA") that provides tax advantages to encourage saving for retirement. Among the advantages of an IRA is that

money is deposited pre-tax into the IRA account, it can grow tax free, and taxes are not paid until withdrawal. However, any withdrawn funds will be included in Mr. Silverman's gross income for the relevant tax year, even though Mr. Silverman will not see that money if it is garnished by the Government. *See* 26 U.S.C. §408(d)(1) (providing that any amount paid or distributed out of an individual retirement plan shall be include in the gross income of the payee or distribute). This is a form of phantom income. Another aspect of an IRA is that if a withdrawal occurs prior to age 59 ½ (an early distribution), the tax for the taxable year is increased by 10 percent of the portion of the withdrawal that is includible in gross income. *See* U.S.C. § 72(t)(1)&(2). Mr. Silverman is 56 years old.

Mr. Silverman argues that if the Government is permitted to garnish his IRA accounts, he will incur significant tax liabilities unfairly. With respect to the tax and early withdrawal penalties associated with the seized IRA accounts, Mr. Silverman insists this would be an unlawful increase in the amount of his fine and restitution orders. Mr. Silverman asserts that 18 U.S.C. § 3572(c) limits the circumstances under which the imposition of a fine in a criminal judgment may be modified, and none of the exceptions allowing modification listed there apply. Mr. Silverman argues that imposing the additional tax penalty liability on Mr. Silverman effectively and impermissibly increases the judgment fine beyond that which was contemplated by the District of New Jersey sentencing court, violating § 3572(c) and negating the procedures that Congress established for the imposition of fines under 18 U.S.C. § 3572(a)&(b). Mr. Silverman cites *United States v. Martinez*, 812 F.3d 1200 (10th Cir. 2015) for the proposition that

the United States does not have the authority to garnish a defendant's retirement accounts when doing so would exceed the terms of the prior restitution order.

As an alternative to quashing the writs in their entirety, Mr. Silverman argues that the Court should not allow the Government to seize the portion of funds necessary to pay the extra income and penalty tax that Mr. Silverman would incur for early withdrawal. Mr. Silverman cites a number of federal district court cases where the United States, in garnishing retirement accounts, either elected to or was prevented from seizing the portion of a garnished account needed to pay taxes on the disbursement.

Thus, as alternative relief to quashing the writs, Mr. Silverman's counsel asked that in the event that the Court does not quash the writs, that the Court in its discretion order that any disbursements from Mr. Silverman's IRA accounts be deposited into the Court registry so that Mr. Silverman can then have his accountant prepare his 2019 Federal and State Income Tax Returns and determine the amount of the taxes and the penalty as a result of the liquidation of the IRA accounts. The amount of those taxes and penalties then should either be paid to Mr. Silverman from the Court Registry or directly to the IRS prior to the payment of any IRA funds to the Government towards restitution. Dkt. #64 at 97:1-12.

### B.    *Doctrine of Res Judicata/Claim Preclusion*

Mr. Silverman also argues that the doctrine of *res judicata* bars the issuance of the writs here in Colorado. The argument is that because writs were first issued in New Jersey and were later dismissed at the request of the United States, the doctrine of claim preclusion must preclude any effort to reissue the writs in Colorado. Under the

doctrine of claim preclusion, "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979). The Silvermans insist that the three criteria necessary for the application of claim preclusion apply here: (1) an identity of parties; (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same transactional facts as the first. *Id*.

### C. Judicial Estoppel

Last, Mr. Silverman argues that the doctrine of judicial estoppel bars enforcement of the writs here in Colorado. Judicial estoppel is a discretionary remedy courts may invoke "to prevent the improper use of judicial machinery." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Mr. Silverman argues that he fully disclosed all his assets at the time of sentencing, including the various accounts listed here. The judgment required him to pay a substantial amount ($500,000) before sentencing and provided for a minimum payment of $1,000 per month going forward. Mr. Silverman has been timely paying the $1,000 per month amount.

When the Government first issued the writs in New Jersey, Mr. Silverman's trial lawyer, Mr. Krovatin called the responsible AUSA, Assistant United States Attorney Christopher Amore, discussed the writs and the fact that Mr. Silverman had been complying with the dollar amount of restitution that the sentencing judge had ordered. Dkt. #64 at 75:7-16. Mr. Amore indicated that while the Government was not bound by the $1,000 minimum monthly payment amount, Mr. Amore "would check into it." Mr. Krovatin testified he had been surprised that the writs had been issued for several reasons. First, the payment schedule was something that had been negotiated with the

U.S. Attorney's Office at the time of Mr. Silverman's plea and sentencing. Second, Mr. Silverman had made the substantial $500,000 initial payment and had been making regular $1,000 payments as indicated in the judgment of conviction.

Mr. Krovatin contacted the sentencing judge's chambers asking to be heard on the issue of the writs. Subsequently, AUSA Amore advised Mr. Krovatin that the writs would be withdrawn, which they were. *Id.* at 75:23-76:12. Because the writs were withdrawn, there was no hearing before the sentencing judge.

Mr. Silverman asserts that "[t]he Government took the position that, based on Mr. Silverman's plea agreement and his consistent payment and performance under the plea agreement and judgment, the property that is the subject of this matter should not be garnished." Mr. Silverman suggests that by withdrawing the writs that had been issued in New Jersey, the Government prejudiced Mr. Silverman by denying him the ability to seek clarity from the sentencing judge on the issue of whether compliance with the $1,000 a month payment schedule should prevent the United States from using other means to collect the judgment.

In sum, Mr. Silverman argues here that having originally sought and then withdrawn the writs after their issuance in New Jersey, the Government now is taking a different position in trying anew to garnish the disputed accounts. According to Mr. Silverman, the circumstances therefore meet the three factors necessary for judicial estoppel to prevent the United States from re-issuing the writs in Colorado. These factors include: (1) a party's subsequent position must be "clearly inconsistent" with its prior position; (2) the suspect party must have succeeded in persuading a court to accept that party's former position, "so that judicial acceptance of an inconsistent

position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped. Dkt. #42 at 8-9 (citing *New Hampshire v. Maine*, 532 U.S. at 750-51).

### D.    Mrs. Silverman Claims to Own the Vanguard Joint Account

With respect to Mrs. Silverman, she makes the same objections as her husband, plus one more. Even if the United States is allowed to seize some portion of the accounts, Mrs. Silverman argues that the money in the Vanguard Joint Account belongs to her and should be exempt from garnishment. And, based on either Pennsylvania or Colorado law, the Vanguard Joint Account should not be used to satisfy the judgment entered against her husband. Mrs. Silverman argues that the entire Vanguard Joint Account is her property based on her net contributions over time and her husband's sizeable withdrawals from the Joint Account.

## V.    Analysis

### A.    The Legal Structure for Enforcement of Restitution Judgments Against Criminal Defendants.

Pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A (2017), courts shall order "that the defendant make restitution to the victim of the offense" when sentencing a defendant convicted of certain crimes. 18 U.S.C. § 3663A(a)(1). As outlined in the federal statute governing the procedure for issuance and enforcement of orders of restitution, the United States may enforce restitution orders in the same manner as criminal fines, and by all available means. 18 U.S.C. § 3664(m)(1)(A). In addition, "[A]n order of restitution made pursuant to section . . . 3664 of this title, is a lien in favor of the United States on all property and rights to property of

the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986." 18 U.S.C. § 3613(c).

Section 3613 provides the civil remedies for satisfaction of an unpaid fine. "The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law." 18 U.S.C. § 3613(a). A judgment imposing a fine may be enforced against all property or rights to property of the person fined, barring three categories of excepted property, such as certain property that is exempt from levy for taxes. 18 U.S.C. § 3613(a)(1)-(3). *See United States v. Loftis*, 607 F.3d 173, 178 n.7 (5th Cir. 2010) (citing 18 U.S.C. § 3613(c) for proposition that once restitution is ordered, all the defendant's property becomes subject to a lien in favor of the United States in the same manner as tax liens); *United States v. Meux*, 597 F.3d 835, 838 (7th Cir. 2010) (stating that liens "based on restitution orders are treated like tax liens"). Thus, if property would be subject to levy through a writ of garnishment to enforce a tax lien, it likewise may be levied to enforce a restitution order. *See United States v. Irving*, 452 F.3d 110,126 (2d Cir. 2006) (holding that ERISA pension plan was not exempt from seizure to satisfy a criminal fine under 18 U.S.C. §3613(a), because the ERISA pension plans are not exempted from payment of taxes).

The Federal Debt Collection Procedure Act of 1990 ("FDCPA"), 28 U.S.C. §§ 3001-3308, sets forth several enforcement practices and procedures available to the United States for the enforcement of a judgment. The FDCPA provides that a "court may issue a writ of garnishment against property (including nonexempt disposable earnings) in which the debtor has a substantial nonexempt interest, and which is in the

possession, custody, or control of a person other than the debtor, in order to satisfy the judgment against the debtor." 28 U.S.C. § 3205 (a).

Courts "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the" collection action. *Drye v. United States*, 528 U.S. 49, 58 (1999).

**B.      The language of the judgment against Mr. Silverman does not preclude the United States from seeking to satisfy the restitution debt via other means, such as by seizure of assets or writs of garnishment.**

Although the Silvermans do not make the argument explicitly in their briefs, during the evidentiary presentation, including testimony by Mr. Silverman and Mr. Krovatin, the implication was that because the judgment states that Mr. Silverman was to "satisfy the amount due in monthly installments of no less than $1,000, to commence 30 days after release from confinement," then so long as Mr. Silverman was fulfilling this minimum payment obligation, the United States should be barred from seeking to seize other assets to satisfy the judgment. As Mr. Krovatin testified about the results of the plea negotiations, "I would have to say it was my understanding that as long as he complied with the payment schedule set forth in the JOC, that the Government would not be taking any further action against him." Dkt. #64 at 81:1-9. This is a different argument than the *res judicata* and judicial estoppel arguments recited above.

In support of this position, Mr. Silverman submitted a "Debtor Statement" document issued by the Department of Justice to Mr. Silverman on October 4, 2019, showing an "Overdue Amount" of $0.00 and a "next payment amount" of $1,000.00. See Dkt. #62-1.

I reject the argument. The plain language of the judgment states that the full amount of the fine and restitution "is due immediately." The fact that the judgment provides that "in the event the entire restitution is not paid prior to the commencement of supervision, the defendant shall satisfy the amount due in monthly installments of no less than $1,000, to commence 30 days after release from confinement," does not mean that the United States is barred from using other collection mechanisms to recoup the owed funds. All it means is that Mr. Silverman is not in violation of the terms of the judgment of conviction so long as he pays the minimum $1,000 amount. I do not read the Debtor Statement to say anything different. Indeed, as noted, the Debtor Statement lists a "total balance" of $2,059,077.31. Dkt. #62-1.

Mr. Krovatin did testify that it was his "understanding" that the United States would not use other collection tools to enforce the restitution order or the fine so long as Mr. Silverman stayed current on the $1,000/month schedule. And Mr. Silverman also testified that the United States had made certain promises to him in connection with the plea: "I was promised that they were not interested in hurting my family, my family's finances, my kids, my wife's finances." Dkt. #64 at 69:3-8. But as far has been presented to me, these promises or understandings are not reflected in any transcript of the sentencing hearing or in the written judgment itself.

The case of *United States v. Martinez,* 812 F.3d 1200 (10th Cir. 2015) (cited by the Silvermans) is instructive on this issue. *Martinez* involved a criminal defendant who had a restitution order entered against him establishing a restitution amount of $2.7 million. The order also set out a specific payment schedule. Notably, the restitution order did not say that the restitution order was "due in full immediately." Mr. Martinez

was compliant with the court-ordered payment schedule, but the United States nevertheless served writs of garnishment for two of Mr. Martinez' retirement accounts. Mr. Martinez moved to quash. The Tenth Circuit held that the writs should be quashed and that the United States could not garnish the accounts. But the court's decision was based on the fact that that the entire Martinez debt was not then due. 812 F.3d at 1203-04. Per the Tenth Circuit's review of the *Martinez* trial court's oral and written restitution order, interpreted with an eye towards the relevant statute and the trial court's discretion to consider the defendant's ability to pay in ordering restitution, the Tenth Circuit in *Martinez* concluded that there had not been an intention by the sentencing court to make the full restitution amount due. Instead, so long as Mr. Martinez complied with the payment schedule, "the full restitution amount would not become immediately due." *Id*. at 1204.

This case is different. Mr. Silverman's judgment of conviction is explicit that the restitution amount and the fine were due immediately. The existence of a minimum payment schedule of $1,000 a month does not change the reality that the full amount of restitution was due and owing.

In addition, the suggestion that the United States would not have the right to seek to collect the unpaid portion of the restitution judgment via lawful methods of collection for so long as Mr. Silverman stayed current with the $1,000/month payment schedule makes little sense given the amount owed (more than $2 million), and Mr. Silverman's assets which, along with those of his wife, total more than $5 million. In his testimony, Mr. Silverman professed a desire to pay off the $2 million restitution judgment when he is able, and also explained a desire to sell the $1.4 - $1.8 million house in Gladwyne,

Pennsylvania once the market is able to pay "what the house is worth." But under the theory articulated by Mr. Krovatin and his alleged understanding with the Government, Mr. Silverman would never have to pay anything more than $1,000 a month, and the United States would never have the right to take any additional steps to execute on the judgment, via writs of garnishment or otherwise, so long as the regular minimal payments were being made. There is no evidence from which I can conclude that the sentencing court in this case intended to limit the Government's ability to take all appropriate measures to collect the outstanding judgment from Mr. Silverman. Nothing about the judgement or the plea agreement prevents the Government from issuing writs of garnishment.

### C. Res Judicata does not apply to bar the United States from seeking writs of garnishment.

The Silvermans accurately recite the three elements necessary for claim preclusion to apply to bar a second suit arising out of the same set of operative facts. *See Wilkes v. Wyoming Dept. of Emply. Div. of Labor Standards*, 314 F.3d 501 (10th Cir. 2006) (listing the three elements). But the second element, that there must have been a prior final judgment on the merits, is missing here. The fact that the United States previously applied for writs, and then voluntarily dismissed those writs after being contacted by counsel for Mr. Silverman, is not a resolution on the merits to be granted preclusive effect. It is the functional equivalent of a voluntary dismissal without prejudice. And a voluntary dismissal without prejudice traditionally does not preclude a second action. *See* 18A Wright, Miller & Cooper, <u>Federal Practice and Procedure: Jusidiction</u>, § 4435 at 129 (3d ed. 2017) (explaining the "general tradition that voluntary

dismissals do not preclude a second action"). *See also* Fed. R. Civ. Pro. 41(a)(1)(B) (voluntary dismissal by plaintiff via notice or stipulation is without prejudice).

There was no determination on the merits by the District Court of New Jersey that the writs were improper or invalid, and no contemporaneous written record of the reason for the withdrawal. Under such circumstances, the United States is not precluded by *res judicata* from attempting to reissue in Colorado the same writs that were withdrawn in New Jersey. The Silvermans cite no authority to the contrary and provide no argument as to why the United States' voluntary withdrawal of the writs in New Jersey could be deemed adjudications on the merits entitled to preclusive effect.

### D. *Garnishment of IRA accounts is not an unfair or illegal increase in the amount of the fine or restitution.*

I do not find that the garnishment of Mr. Silverman's accounts, including his tax-deferred IRA accounts, represents an unfair or illegal increase in the amount of the fine or restitution. Mr. Silverman's argument is that because his investment account assets are in a form that, if liquidated, would result in an income tax bill, or an early withdrawal tax penalty, by garnishing these accounts the United States will be unfairly increasing the amount of the fine or restitution. Not so. The amount of the fine or restitution judgment does not change. There is no authority cited for the proposition that seizure of assets that result in phantom income (and an associated tax bill) modifies or increases the fine in a criminal judgment in violation of 18 U.S.C. § 3572.

It is necessarily the case that when assets other than cash or checking accounts are liquidated, there are always some transaction costs involved. If real estate is sold or foreclosed upon, there will necessarily be fees and costs associated with the auction or closing on the property. If assets are held in a foreign currency, there will be a fee

associated with the exchange of that currency into dollars. And securities, if sold, will presumably have a broker's commission associated with the sale, and likely have some capital gain tax resulting. The fact that seizure and liquidation of non-liquid assets to satisfy a judgment imposes additional costs, or indeed taxes, on the owner and judgment debtor, does not mean that the amount of the fine has increased. Mr. Silverman has other assets (including real estate) that he could liquidate to satisfy part of the judgment. But he has chosen not to, apparently waiting for the real estate market in Philadelphia to improve. *See* Dkt. #64 at 60:2-4; 69:15-17.

The Tenth Circuit has approved the IRS's levy of a delinquent taxpayer's IRA account to satisfy a federal tax debt. *See Kane v. Capital Guardian Trust Company*, 145 F.3d 1218, 1220 (10th Cir. 1998). And in *United States v. Dixon*, 2007 WL 163245 (D. Kan. 2007), the court permitted the garnishment of tax-qualified retirement plans to satisfy a $1.5 million restitution judgment over the objection that garnishment and liquidation of the full value of a 401(k) Savings Plan would impose on the defendant additional tax liabilities or penalties:

> Finally, defendant argues the garnishment of his 401(k) Savings Plan should be limited if income tax or penalties apply. 18 U.S.C. § 3613 allows the government to enforce restitution "in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law." 18 U.S.C. § 3613(a). Federal law places various restrictions on the type and amount of properties that can be garnished. *See, e.g.*, 15 U.S.C. § 1673 and 18 U.S.C. § 3613. But the court has not found any law that prohibits the garnishment of 401(k) plans or that limits the amount garnished based on penalties or tax liabilities, and the parties have cited to none. Therefore, the court finds that the 401(k) Savings Plan may be garnished without consideration of tax liabilities or penalties.

*Dixon*, 2007 WL 163245 at *2.

Mr. Silverman cites the *Martinez* case for the proposition that "the Government did not have the authority to garnish the defendant's retirement accounts because such a garnishment would exceed the terms of the prior restitution order." Dkt. #59 at 2. But, as noted previously, the *Martinez* result was based on the fact that the restitution judgment in that case was not "due immediately." *See Martinez*, 812 F.3d at 1202 ("To decide this appeal, we ask: Can the government garnish assets beyond the amount currently due under Mr. Martinez' court-ordered payment schedule?"). Here, by contrast, the restitution judgment was due immediately, so the *Martinez* case reasoning does not apply.

Mr. Silverman also cites retirement account garnishment cases where funds necessary to pay penalties and tax liabilities were deposited into the registry of the court. *See United States v. Renfrow*, C17-1305-TSZ, 2017 WL 6389303 (W.D. Wash. Dec. 14, 2017); *United States v. Crundwell*, No. 12 CR 50027-1, 2015 WL 269552 (N.D. Ill., Jan. 21, 2015); and *United States v. Simpson*, No. 3:09-CR-215-M-BK, 2014 WL 5032718 (N.D. Tex., Oct. 8, 2014). But none of these cases is analogous to the instant situation, and none appears to involve the question whether funds necessary to pay penalties and taxes must be, as a matter of law, set aside when a retirement account is garnished to satisfy a restitution judgment.

The *Crundwell* case, for example, directs the holder of the garnished account to turn over the total retirement account "less any statutorily mandated withholding taxes." *Crundwell*, 2015 WL 269552 at *1. There is no suggestion in this case that any portion of the garnished IRA account is subject to "statutorily mandated withholding." In the *Renfrow* case, the defendant did not request a hearing or otherwise object to a

garnishment proceeding involving her rollover individual retirement account with Scotttrade, and the garnishee was directed to pay to the Court the entire amount of the account "less any federal tax withholdings paid to the Internal Revenue Service." 2017 WL 6389303 at *1. It is not clear from *Renfrow* opinion whether exempting the withholding paid to the IRS was a matter of agreement between the United States and the defendant in that case, but there is no explanation in the opinion for limiting the garnishment of the IRA account in that way, and no legal basis requiring such a limitation. The *Simpson* case is no different from the *Crundwell* matter, with the Court permitting the garnishment of a debtor husband share of a retirement account "less any tax withholding required by law." 2014 WL 5032718 at *3. Again, there has been no evidence presented here that withdrawal of any portion of the disputed IRA account would require any "withholding required by law." Absent any statutory requirement, I see no legal basis for preventing the United States from seizing the full amount of the disputed IRA account, regardless of the tax implications (including tax penalty implications) to Mr. Silverman of the early withdrawal.

Neither I do not see any equitable basis for setting aside a portion of the IRA account to provide for taxes and penalties associated with the restitution order. Mr. Silverman testified that his federal income tax liability as a result of all the funds being disbursed from the Vanguard IRA would be "in the magnitude of $135,000." Dkt. #64 at 37:1-7. Nevertheless, the sentencing judge ordered that restitution be due and payable "immediately." The sentencing judge could have done something different, like implementing a payment plan as a function of the ability to pay. Based on Mr.

Silverman's listing of assets in the pre-sentence report, Mr. Silverman is not without the resources to pay down a significant portion of the remaining restitution debt.

### E. The United States is not judicially estopped from issuing the writs here.

I do not agree that the United States is judicially estopped from re-issuing in Colorado the previously withdrawn New Jersey writs. The reason for the withdrawal of the writs is somewhat disputed. Mr. Krovatin says the writs were withdrawn after he communicated his position to the AUSA in New Jersey that Mr. Silverman was complying with his minimum payment obligation. Mr. Krovatin believes that they were in fact withdrawn for that reason. The United States, for its part, rejects the notion that the writs were withdrawn based on Mr. Silverman's compliance with the $1,000/month payment plan. Instead, per Mr. Amore's Declaration (Dkt #54-2), the writs were withdrawn because the Financial Litigation Unit of the United States Attorney's Office in New Jersey had not been aware that, at the time the writs of garnishment were issued, the district judges in New Jersey and the Eastern District of Pennsylvania had previously transferred jurisdiction. Mr. Amore says that his office requested that the Court withdraw the writs of garnishment when it became clear that the District of New Jersey had lacked jurisdiction to issue the writs in the first place because of the transfer of jurisdiction. *Id.* at ¶2(a)-(c).

A review of the docket in New Jersey does not reflect any basis or reasoning behind the withdrawal of the writs by that Court. But neither is there any evidence that any kind of representation was made by the United States to the District Court for the District of New Jersey.

I accept and credit Mr. Krovatin's testimony that he called AUSA Amore to dispute the issuance of the writs and argue that the writs should be withdrawn because

of Mr. Silverman's compliance with the $1,000 month minimum payments reflected in the judgment. However, Mr. Krovatin testified that that Mr. Amore never made any promise that the United States would not seek to garnish Mr. Silverman's property in the future. Mr. Krovatin merely presumed that in withdrawing the writs, Mr. Amore had accepted the explanation about Mr. Silverman's compliance and timely restitution payments. Mr. Amore never made any specific representations to that effect. Mr. Amore never told Mr. Krovatin specifically why the writs were being withdrawn. Transcript at 76:23-77:16. In addition, during the initial conversation with Mr. Amore, Mr. Amore had told Mr. Krovatin that the Government did not feel it was bound by the $1,000 payments to not seek other methods of collecting the outstanding debt. Transcript at 75:11-22.

In any event, even accepting as true Mr. Krovatin's testimony, I do not find that the necessary elements of judicial estoppel have been proven. Judicial estoppel is an equitable doctrine that prevents abuse of the judicial process. *New Hampshire v. Maine*, 532 U.S. 742, 750–51. Judicial estoppel prohibits a party from deliberately changing positions to suit its needs. *Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007). Because judicial estoppel is an equitable doctrine, a court must consider all of the equities of a particular case. *Id.* Judicial estoppel should be applied narrowly and cautiously. *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011). A court may invoke judicial estoppel at its discretion to prevent improper use of judicial machinery. *Kaiser v. Bowlen*, 455 F.3d 1197, 1204 (10th Cir. 2006); *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005).

Assuming the truth of Mr. Krovatin's testimony, I nevertheless find no abuse of the judicial process here that would justify the deployment of the judicial estoppel

doctrine. Most important, I find no evidence of the second factor -- that the United States had succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled. There is no evidence that the New Jersey Court was misled in any way. The mere withdrawal of the New Jersey writs, without filing any explanation or reason for the withdrawal, is not something that would have misled the New Jersey Court. And there was never any representation by the United States to the New Jersey Court inconsistent with the position being taken here. There was never any statement, in a brief or otherwise, to the District of New Jersey that the United States agreed it was barred by Mr. Silverman's $1,000/month payments from taking other steps to collect the restitution judgment. There was no acceptance by the New Jersey district court judge of any particular legal or factual position advanced by the United States.

In addition to absence of the second factor of judicial estoppel, as noted above, I do not find any equitable considerations would justify preventing the United States from issuing the writs of garnishment here in Colorado. Mr. Silverman and his wife own multiple homes, including one in Pennsylvania that is worth between $1.4 and $1.8 million that he and his family do not even live in. Mr. Silverman says he has not sold that house to satisfy the judgment because of the adverse market conditions in Pennsylvania. But he is protesting the United States' efforts to seize other more liquid assets. The sentencing court made the restitution due immediately. The law requiring restitution is titled the "*Mandatory* Victims Restitution Act." There is no basis under the doctrine of judicial estoppel to bar the United States from seeking to seize Mr.

Silverman's accounts, or other assets that Mr. Silverman may have that are not exempt from seizure. Mr. Silverman committed a crime and owes approximately $2 million in restitution to his victims. The United States is trying to make those victims whole. Equity will not step in to prevent the United States from making whole the victims of Mr. Silverman's criminal conduct.

## VI. *Mrs. Silverman's objection that she owns some portion of the Vanguard Joint Account as her own property is well taken.*

Mrs. Silverman argues that the Vanguard Joint Account, valued at $179,569.98 on the date Vanguard received the writ, constitutes her own separate property despite the account being denominated a "joint account." Mrs. Silverman argues that Mr. Silverman's judgment does not reach her own separate property and therefore the Vanguard writ should be quashed to the extent it seeks to garnish the joint brokerage account.

Mrs. Silverman argues that a matter of fact, over the course of time, she deposited in excess of $180,000 of her own money in this account. And, to the extent possible, a net accounting demonstrates a balance in favor of Mrs. Silverman in the account in excess of $180,000. As a result of the resources expended from this account on behalf of Andrew Silverman related to his criminal defense, Mr. and Mrs. Silverman "intended that the [remaining] money in this account belongs to Tracey Silverman." Dkt. #43 at 12. "By fact and intent," Mrs. Silverman argues, the money in the joint account belongs to Mrs. Silverman and should be exempt from attachment. *Id.*

### A. *Factual findings relating to the Vanguard Joint Account*

The Vanguard Joint Account is held jointly between Mrs. Silverman and Mr. Silverman. The Vanguard Joint Account was opened after the Silvermans had moved to

Colorado. Dkt. #64 at 51:2-14. According to the Vanguard Brokerage Account Agreement governing the Joint Account, "each Account Owner has authority, acting individually and without notice to the other Account Owner, to deal with [Vanguard] as fully and completely as if the Account Owner was the sole Account Owner." Dkt #55-4 at 10.

When Mr. Silverman was President and CEO of DataQ, he earned $25,000 per month. Mrs. Silverman's income as a teacher was relatively small by comparison and it seems beyond dispute that the majority of the Silvermans' family wealth was accumulated due to Mr. Silverman's business success.

Mrs. Silverman asserts that after 2011, the majority of the deposits that went into that account were either jointly owned by the Silvermans (50 percent each), or were Mrs. Silverman's money, an example being a gift from her father in the amount of $10,000. In terms of jointly-owned funds deposited into the Joint Account, Mrs. Silverman points to tax refunds on the joint tax return as an example. Another example are the proceeds from the sale of Mr. Silverman's Porsche sportscar.

In addition, Mr. Silverman testified that he spent a substantial amount of his own money from this Joint Account for his legal defense, resulting in the balance of the funds in the Joint Account necessarily belonging to Mrs. Silverman. Mr. Silverman wrote the $500,000 initial restitution payment from the Joint Account. Dkt. #64 at 47:13-18. Since 2015, when the $500,000 check was written, Mr. Silverman says he has had no involvement in the Joint Account. Mrs. Silverman took control. Dkt. #64 at 48:16-23.

I am not convinced that all or even a substantial portion of the money left in the Joint Account belongs to Tracy Silverman alone. The account appears to have been

treated truly as a "joint" account, with Mr. Silverman depositing substantial tax refunds (mostly the result of his own earned income from his role in his company), and also making substantial withdrawals to address his legal issues. I do not find it plausible that the remaining money in the Joint Account was the result of net contributions by only to Mrs. Silverman. I was not persuaded by Mr. Silverman's testimony purporting to lay out an accounting of net contributions. On the witness stand, Mr. Silverman was not forthcoming and on cross-examination appeared evasive, refusing to answer directly a number of pointed questions from opposing counsel. But neither do I find that the assets remaining in the Joint Account were solely the result of net contributions by Mr. Silverman. The evidence presented was not convincing either way.

**B.    *Legal conclusions regarding the Joint Account***

First, I believe that to the extent state law has any role in this matter, Colorado is the appropriate state and its law should apply. The Vanguard Joint Account was established after the Silvermans had moved to Colorado and they are currently residents of Colorado. I do not find relevant the fact that some of the money later transferred into the Joint Account was originally earned while the Silvermans were residents of Pennsylvania.

Second, under Colorado law, a joint account shared by a married couple is presumptively owned 50/50:

> During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent. As between parties married to each other, in the absence of proof otherwise, the net contribution of each is presumed to be an equal amount.

Colo. Rev. Stat. Ann. § 15-15-211(2). Here, as discussed above, I am not persuaded that remainder of the Vanguard Joint Account consists only of Mrs. Silverman's net contributions. In addition, there is no "clear and convincing" evidence of the parties' intent. Mr. Silverman testified that it was the intent that the Vanguard Joint Account belong to his wife, but I discount that testimony as self-serving without any corroborating evidence. Mrs. Silverman did not take the witness stand. Here, the Silvermans are married, and with respect to the presumed equal ownership of the Joint Account, there is an "absence of proof otherwise." Therefore, I will apply the Colorado legal presumption that the net contribution of each married party is an equal amount: the Joint Account therefore belongs 50 percent to Mr. Silverman and 50 percent to Mrs. Silverman.

Having determined that one-half of the money in the Joint Account is the property of Mrs. Silverman under Colorado law, the next question is whether the United States is entitled nevertheless to garnish her portion of the Joint Account. The United States argues that under the FDCPA and the MVRA, the United States may garnish all of an account where the defendant has a "substantial right" in the property. And here, under the terms of the Vanguard account agreement, each party has the right to withdraw the entire amount. The United States steps into the shoes of Mr. Silverman. *See Kane v. Capital Guardian Trust Co.*, 145 F.3d 1218, 1223 (10th Cir. 1998) (explaining that upon delivery of notice of tax levy to bank, I.R.S. stepped into shoes of the delinquent taxpayer and acquired all of the taxpayer's rights in a retirement account, including right to liquidate shares and withdraw cash proceeds). And since Mr. Silverman has the right, as a joint account owner, to withdraw the entire amount of the account, the United

States asserts it has the right to garnish the entire amount of the account, regardless of whether, in a dispute between Mr. and Mrs. Silverman, she would be entitled to half of the account.

The caselaw on this issue appears somewhat unclear. Mrs. Silverman cites *United States v. Craft*, 535 U.S. 274 (2002), where the Supreme Court held that where property was held by a husband and wife as tenants by the entireties (under Michigan law), and only the husband was a tax debtor, the federal tax lien only attached to the husband's portion of the property. *See Craft*, 535 U.S. at 1423 (describing the rights of spouse to property by the entireties, and concluding that those "rights alone may be sufficient to subject *the husband's interest* in the entireties property to the federal tax lien")(emphasis added). A tenancy by the entirety is somewhat different from the joint account ownership situation seen here, because a tenant by the entirety under Michigan law has the right to alienate the property only with the consent of the spouse. *Id.* at 1423. By contrast, Mr. Silverman has the unilateral right to withdraw the entire amount of the Joint Account without Mrs. Silverman's consent.

In *United States v. National Bank of Commerce*, 472 U.S. 713 (1985), the Supreme Court approved the right of the United States to subject an entire joint account to a provisional IRS levy, finding that a delinquent taxpayer's unrestricted right to withdraw constitutes "property" or "rights to property." "The IRS acquires whatever rights the taxpayer himself possesses. And in such circumstances, where, under state law, a taxpayer has the unrestricted right to withdraw funds from the account, 'it is inconceivable that Congress ... intended to prohibit the Government from levying on that which is plainly accessible to the delinquent taxpayer-depositor'." 472 U.S. at 725

(quoting *United States v. First National Bank of Arizona*, 348 F.Supp. 388, 389 (D. Ariz. 1970). But, in the *National Bank of Commerce* case, the levy was only provisional, and there remained methods by which the non-debtor joint account owner could later establish ownership of a portion of the property.

An unpublished case out of the Fifth Circuit, *United States v. Seymour*, 275 Fed.Appx. 278 (5th Cir. 2008), addressed a similar situation where the district court had found that only one-half of a joint husband-wife bank account should be subject to a pending garnishment for a restitution order after the husband's bank fraud conviction. But, looking to Mississippi law, the Fifth Circuit reversed. In *Seymour*, the United States had served a writ of garnishment on the joint account, and the innocent wife filed an objection, claiming to be the equitable owner of half of the account's funds based on her marriage and the funds' having been accumulated during the course of the marriage. Consistent with the innocent wife's position, the district court denied the government's turnover motion in part, and ordered half the funds to be turned over and half to remain in the joint account for the benefit of the wife. *Id.* at 280. Reversing, the Fifth Circuit explained that under the Federal Debt Collection Procedures Act, the United States may garnish a debtor's jointly-owned property to enforce a criminal restitution order to the extent allowed by the law of the state where the property is located. *Id.* (*citing* 18 U.S.C. § 3613(a); 28 U.S.C. §§ 3010(a), 3205(a)). The Fifth Circuit noted that under Mississippi law, a joint account is *prima facie* subject to garnishment, and when claiming a portion of that account exempt from garnishment, the burden is on a joint owner to establish the portion of the funds she owns. Because the innocent wife in *Seymour* presented no evidence of the contributions she had made to the joint account, she did not establish

any ownership of the funds. So, all the joint account funds in *Seymour* were subject to the pending garnishment. *Id.*

The rule appears to be that "[o]nce state-law property interests are defined, federal law controls the consequences." *United States v. Elashi*, 789 F.3d 547, 552 (5th Cir. 2015). Here, under Colorado's presumption related to marital joint accounts, which defines the state-law property interests, the Silvermans each own half of the joint account. *See Harvey v. Harvey*, 841 P.2d 375 (Colo. App. 1992) (rejecting notion that creditor of husband could seize entirety of joint bank account over wife's objection and holding that clear and convincing evidence is required to rebut the 50/50 presumption set forth in the second sentence of § 15-15-211(2)). Per Colorado state law, Mrs. Silverman's half of the joint account is not "property" of Mr. Silverman that is subject to garnishment. This case is like the *Seymour* case discussed above, but the result is different because of how Colorado law differs from Mississippi law. In Colorado, by statute, absent clear and convincing evidence to the contrary, the legal presumption is that married joint account owners contributed equally to the joint account, and thus own the account in equal proportions. Colo. Rev. Stat. Ann. § 15-15-211(2).

Therefore, based on my findings above that there is no persuasive evidence as to the respective net contributions of each of the Silvermans to the Joint Account, under Colorado's legal presumption, I conclude that only one half of the Vanguard Joint Account is property of Mr. Silverman that is subject to the writ of garnishment. The other half is not property of Mr. Silverman. It is the property of Mrs. Silverman and should not be subject to the writ of garnishment.

**VII.    Conclusion**

For the reasons stated above, it is **HEREBY RECOMMENDED** that:

- That Defendant Andrew Silverman's Objections, Claims of exemption, and Response to Writs of Garnishment (Dkt. #42) be **OVERRULED and DENIED**.

- That Interested Party Tracy Silverman's Objections, Claims of Exemption, and Response to Writs of Garnishment (Dkt. #43) be **SUSTAINED IN PART AND OVERRULED IN PART.** It is recommended that Tracy Silverman's objection to the garnishment of the Vanguard Joint Account be sustained to the limited extent that one-half of the Vangaurd Joint Account should be deemed property of Mrs. Silverman and be exempt from garnishment. It is further recommended that Mrs. Silverman's objections and claims of exemption be overruled and denied in all other respects.

**IT IS FURTHER ORDERED that, pursuant to Fed. R. Crim. P. 59, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.**

DATED this 13th day of December, 2019.

BY THE COURT

N. Reid Neureiter
U.S. Magistrate Judge